IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No. 5:20-cv-00559-D

| | | |
|---|---|---|
| FREDRICK DARNELL HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CITY OF RALEIGH NORTH | ) | **CITY OF RALEIGH'S ANSWER TO** |
| CAROLINA, LT KLUEGER, K.N. WALL, | ) | **AMENDED COMPLAINT** |
| A.E. JONES, S.O. EDMONDS, M.O. GLEN, | ) | |
| S.T. HENRY, B.S. HARRIS, M.S. HORNER, | ) | |
| JOHN DOE I, JOHN DOE II, JOHN DOE III, | ) | |
| JOHN DOE IV, JOHN DOE V, and JOHN | ) | |
| DOE VI in their individual capacities | ) | |
| | ) | |
| Defendants | ) | |

NOW COMES the City of Raleigh, North Carolina (hereinafter the "City"); by and through undersigned counsel and offers the following in answer to the numbered allegations of the First Amended Complaint:

FIRST DEFENSE: ANSWER

1.      Admitted upon information and belief.

2.      Admitted upon information and belief.

3.      It is admitted that at all times relevant herein, the City was and is a municipal corporation and a political subdivision of the State of North Carolina. It is further admitted that at all times relevant herein, the Raleigh Police Department (hereinafter, the "RPD") was a component part of the City, and that all sworn law enforcement officers employed by the City were invested with the authority and duties of law enforcement officers pursuant to North Carolina law. Except as admitted herein, the allegations contained in this paragraph are denied.

1

4.      It is admitted that at all times relevant herein, Cassandra Deck-Brown (hereinafter, "Chief Deck-Brown") was the Chief of Police for the City of Raleigh, North Carolina, that she served as the administrative head of the RPD, and that she prepared the policies for the Department. It is further admitted that Chief Deck-Brown was a citizen and resident of Wake County, North Carolina, and that Plaintiff named her as a defendant in her official capacity. Except as admitted herein, the allegations contained in this paragraph are denied.

5.      It is admitted that Ruffin Hall (hereinafter, "City Manager Hall") was at all times relevant herein the City Manager for the City of Raleigh, North Carolina, that he was a citizen and resident of Wake County, North Carolina, and that Plaintiff named him as a defendant in his official capacity. Except as admitted herein, the allegations contained in this paragraph are denied.

6.      It is admitted that at all times relevant herein, Defendant Krueger was employed by the City as a member of the RPD. It is further admitted that Defendant Krueger is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

7.      It is admitted that at all times relevant herein, Defendant Wall was employed by the City as a member of the RPD. It is further admitted that Defendant Wall is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

8.      It is admitted that at all times relevant herein, Defendant Edmonds was employed by the City as a member of the RPD. It is further admitted that Defendant Edmonds is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

9.     It is admitted that at all times relevant herein, Defendant Glenn was employed by the City as a member of the RPD. It is further admitted that Defendant Glenn is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

10.     It is admitted that at all times relevant herein, Defendant Henry was employed by the City as a member of the RPD and was a citizen of North Carolina. It is denied that Defendant Henry is a resident of Wake County. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

11.     It is admitted that at all times relevant herein, Defendant Harris was employed by the City as a member of the RPD. It is further admitted that Defendant Harris is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

12.     It is admitted that at all times relevant herein, Defendant Jones was employed by the City as a member of the RPD. It is further admitted that Defendant Jones is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

13.     It is admitted that at all times relevant herein, Defendant Horner was employed by the City as a member of the RPD. It is further admitted that Defendant Horner is a resident of Wake County and a citizen of North Carolina. Except as herein admitted, the remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.

14.     The allegations contained in this paragraph constitute legal conclusions or prayers for relief to which no responsive pleading is required.

15.     These allegations are too vague to enable the City to form a response. To the extent a response is required, it is admitted that at all times relevant herein, the City was engaged in law enforcement and performed this function in accord with state and federal law, the United States Constitution, and in conformity with all applicable law enforcement practices and procedures. Except as herein admitted, the City lacks information sufficient to form a belief as to the remaining allegations of this paragraph and cannot provide a response until the allegations of this paragraph are set forth in more definite form.

16.     The allegations contained in this paragraph constitute legal conclusions or prayers for relief to which no responsive pleading is required.

17.     It is admitted that at all times relevant herein, the City purchased liability insurance providing certain coverage for certain claims in excess of one million dollars ($1,000,000.00) and with a limit of liability of ten million dollars ($10,000,000.00). For all claims under one million dollars ($1,000,000.00), the City was and remains wholly self-insured and has not waived its immunity through the purchase of insurance. For all claims falling within the City's one million dollar ($1,000,000.00) self-insured retention, the City waives its governmental immunity only pursuant to the *Waiver of Immunity Interim Guidelines* enacted by the Raleigh City Council on January 19, 1999 and incorporated herein by reference. It is expressly denied that the City and any of its agents, employees and officers waived any sovereign or governmental immunity applicable to any of Plaintiff's claims. Except as admitted herein, these allegations are denied.

18.     It is admitted that at all times relevant herein, the City was the employer of Defendant Krueger, Defendant Wall, Defendant Edmonds, Defendant Glenn, Defendant Henry, Defendant Harris, Defendant Jones, and Defendant Horner (hereinafter collectively, the "Defendant Officers"). Except as admitted herein, these allegations are denied.

4

19.     It is admitted upon information and belief that on August 17, 2018, Plaintiff exited his vehicle and left it in one of the travel lanes of Garner Road at its intersection with Martin Luther King, Jr. Blvd.  Except as admitted herein, the City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, except as admitted herein, these allegations are denied.

20.     The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, these allegations are denied.

21.     It is admitted upon information and belief that Plaintiff exited his vehicle and left it in one of the travel lanes of Garner Road at its intersection with Martin Luther King, Jr. Blvd.  It is further admitted upon information and belief that after exiting his vehicle, Plaintiff apparently began to disrobe while standing/walking in the roadway.  Except as admitted herein, the City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, except as admitted herein, these allegations are denied.

22.     The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, these allegations are denied.

23.     The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, these allegations are denied.

24.     The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, these allegations are denied.

25.     The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.  Therefore, these allegations are denied.

26.     It is admitted upon information and belief that Defendant Harris asked Plaintiff for his driver's license and that Plaintiff complied.  Except as admitted herein, the City lacks

information sufficient to form a belief as to the truth or falsity of these allegations. Therefore, these allegations are denied.

27. It is admitted upon information and belief that Plaintiff walked away from Officer Harris without his driver's license and began to drive off despite Officer Harris' instructions to the contrary. Except as admitted herein, the City lacks information sufficient to form a belief as to the truth or falsity of these allegations. Therefore, except as admitted herein, these allegations are denied.

28. It is admitted upon information and belief that Plaintiff attempted to drive away without his driver's license despite Officer Harris' instructions to the contrary, and that Officer Harris prevented Plaintiff from departing the scene by shutting off Plaintiff's vehicle. Except as admitted herein, the City lacks information sufficient to form a belief as to the truth or falsity of these allegations. Therefore, except as admitted herein, these allegations are denied.

29. The City lacks information sufficient to form a belief as to the truth or falsity of these allegations. Therefore, these allegations are denied.

30. The allegations contained in this paragraph are denied.

31. It is admitted that Plaintiff became physically violent with the RPD officers who had responded to the scene, and that reasonable and lawful force was used to restrain the Plaintiff and to prevent Plaintiff from inflicting serious injury upon one or more of the officers. Except as admitted herein, the City lacks information sufficient to form a belief as to the truth or falsity of these allegations. Therefore, except as admitted herein, these allegations are denied.

32. The allegations contained in this paragraph are denied.

33. It is admitted that the Defendant Officers' reports speak for themselves. Except as admitted herein, the allegations contained in this paragraph are denied.

6

34.    The allegations contained in this paragraph are denied.

35.    The allegations contained in this paragraph are denied.

36.    It is admitted that Chief Deck-Brown was asked to address the Raleigh City Council on May 21, 2019 during the Council's consideration of various options for a police oversight board.    During her remarks to the City Council, Chief Deck-Brown highlighted the accomplishments of the RPD, including its voluntary accreditation status. She listed several statistics regarding police and community interactions, including 911 calls, self-initiated calls, and traffic stops. Of the 375,800 interactions in 2018, a total of 49 internal affairs complaints were generated and 379 interactions involved use of force. 26 of the complaints were from citizens or residents and 23 were internally generated. Among her remarks, Chief Deck-Brown stated, "I am the first to say we're not a perfect organization, we're not a perfect department and neither do we claim to be, but we strive very hard to recognize our shortcomings and work to overcome them." Chief Deck-Brown also stated, "I must ask at what point does performance become so restrictive that officers simply cannot do their jobs.  They are the ones running towards danger at the risk of their own lives," and that "trust works both ways. When we talk about accountability, our community has a responsibility to be accountable for their own actions as well."  It is further admitted that on May 29, 2020, Chief Deck-Brown provided the following official statement in response to the death of George Floyd while in custody of the Minneapolis Police Department:

> The incident occurring this week in Minneapolis is very disheartening and a concern to the law enforcement profession as a whole. While the vast majority of law enforcement officers serve with the highest degree of fairness, compassion and integrity, the actions of a few officers can create a ripple effect that has the potential to negatively impact us all.
>
> Officers are expected to uphold the professional standards that require adhering to proper training, protocols and procedures, not only here in Raleigh, but across the country. To act in any way that is contrary to upholding professional standards is unacceptable behavior that cannot and should not be rationalized, excused or overlooked.

7

> We call on law enforcement professionals everywhere to hold every human life of equal value; to demonstrate compassion; to strive to be instruments of positive change; to be deliberate in building better communities for all; and to be unrelenting in the important work of fostering trust and transparency.

Except as admitted herein, the allegations contained in this paragraph are denied.

37. The allegations contained in this paragraph are denied.

38. The allegations contained in this paragraph are denied.

39. The allegations contained in this paragraph are denied.

40. It is admitted that Chief Deck-Brown was asked to address the Raleigh City Council on May 21, 2019 during the Council's consideration of various options for a police oversight board. During her remarks to the City Council, Chief Deck-Brown highlighted the accomplishments of the RPD, including its voluntary accreditation status. She listed several statistics regarding police and community interactions, including 911 calls, self-initiated calls, and traffic stops. Of the 375,800 interactions in 2018, a total of 49 internal affairs complaints were generated and 379 interactions involved use of force. 26 of the complaints were from citizens or residents and 23 were internally generated. Among her remarks, Chief Deck-Brown stated, "I am the first to say we're not a perfect organization, we're not a perfect department and neither do we claim to be, but we strive very hard to recognize our shortcomings and work to overcome them." Chief Deck-Brown also stated, "I must ask at what point does performance become so restrictive that officers simply cannot do their jobs. They are the ones running towards danger at the risk of their own lives," and that "trust works both ways. When we talk about accountability, our community has a responsibility to be accountable for their own actions as well." It is further admitted that on May 29, 2020, Chief Deck-Brown provided the following official statement in response to the death of George Floyd while in custody of the Minneapolis Police Department:

The incident occurring this week in Minneapolis is very disheartening and a concern to the law enforcement profession as a whole. While the vast majority of law enforcement officers serve with the highest degree of fairness, compassion and integrity, the actions of a few officers can create a ripple effect that has the potential to negatively impact us all.

Officers are expected to uphold the professional standards that require adhering to proper training, protocols and procedures, not only here in Raleigh, but across the country. To act in any way that is contrary to upholding professional standards is unacceptable behavior that cannot and should not be rationalized, excused or overlooked.

We call on law enforcement professionals everywhere to hold every human life of equal value; to demonstrate compassion; to strive to be instruments of positive change; to be deliberate in building better communities for all; and to be unrelenting in the important work of fostering trust and transparency.

Except as admitted herein, the allegations contained in this paragraph are denied..

41.     The allegations contained in this paragraph are denied.

42.     The allegations contained in this paragraph are denied.

43.     It is admitted that on the evening of November 8, 1991, Officer Vincent Kerr was one of several RPD officers participating in a buy/bust operation related to illegal drugs. Officer Kerr was the first RPD officer to approach a group of suspects which included Ivan Ingram. Officer Kerr identified himself as a police officer and ordered the group of individuals to get on the ground. Instead of complying with Officer Kerr's commands, Ingram proceeded to walk away from the group. Officer Kerr paralleled Ingram while continuing to shout commands to stop and get on the ground. Ingram walked another fifteen to twenty feet before stopping and turning towards Officer Kerr. Continuing to ignore Officer Kerr's repeated commands, Ingram began a series of movements and physical contortions before suddenly crouching and placing his left hand into his left jacket pocket. Ingram then took a single large step, simultaneously closing the distance between himself and Officer Kerr by two to three feet and pivoting to face Officer Kerr. Ingram then proceeded to rise, pull his hand out of his pocket, and advance on Officer Kerr. Because Ingram's conduct caused Officer Kerr to reasonably believe that Ingram presented an imminent

9

threat of death or serious bodily injury, Officer Kerr fired a single shot at Ingram with his Department-issued weapon. Ingram's estate filed a wrongful death suit against the City and Officer Kerr in Wake County Superior Court. The Court granted the City's motion to dismiss and granted Officer Kerr's motion for summary judgment. Both rulings were later affirmed by the North Carolina Court of Appeals. As the events concerning Officer Kerr's interaction with Ivan Ingram occurred twenty-nine years ago, the City Defendants lack information sufficient to form a belief as to the truth or falsity of Plaintiff's allegation concerning Ingram being unarmed. Therefore, except as admitted herein, the allegations contained in this paragraph are denied.

44.     It is admitted that on March 11, 2004, RPD officer C. M. Keeler responded to a shoplifting call at an ABC Store located at 2109 Avent Ferry Road. Upon arrival, Officer Keeler encountered Derek Haithcock, who had just left the ABC Store without paying for a bottle of liquor. While Haithcock complied throughout a patdown procedure and mini-search, when he was handcuffed and questioned about his activities, he broke away and attempted to evade arrest. Officer Keeler pursued Haithcock and was ultimately able to restrain him and bring him to a prone position in the parking lot. Haithcock's continued attempts to fight and kick Officer Keeler prompted several civilian witnesses to come to Officer Keeler's assistance in restraining Haithcock. Haithcock's violent struggles included grinding his own face into the asphalt, causing himself to bleed. Officer Keeler summoned assistance from other RPD officers and EMS. As additional officers arrived, they assisted Officer Keeler in attempting to gain control of Haithcock who continued to struggle. All civilian witnesses consistently reported that they never observed the officers using any striking techniques and were quick to point out that the officers pleaded with Haithcock to stop struggling and to calm down. However, anytime the officers began to relax their attempts at restraint in response to Haithcock's diminished struggling, this resulted in the officers

10

being kicked and struck again by Haithcock's thrashing legs and body. During their attempts to gain control over Haithcock, officers noticed that Haithcock's face was turning blue, yet he continued to struggle. Haithcock was moved from his side to his back as his struggling subsided. Haithcock lost consciousness and could not be revived. Haithcock was later pronounced dead at Wake Medical Center. Haithcock was determined to have been suffering from a bi-polar condition, had previous mental commitments, had a history of assaulting his wife, was a drug addict, and had committed several larcenies within the two-day period before his death. An autopsy of Haithcock revealed that he died due to cocaine poisoning. Except as admitted herein, the allegations contained in this paragraph are denied.

45. It is admitted that on November 2, 2004, RPD officer S. B. Wolfe and Sgt. Craig Haines were dispatched to 4608 Brocton Drive to serve an arrest warrant on Navon L. Ligon. Earlier in the day, Ligon's girlfriend had sworn a warrant for Ligon's arrest for assaulting her. Ligon's girlfriend reported that he had said to her that if police came one of them would not go home tonight. Ligon's girlfriend also reported that Ligon had talked about wanting to die in the past when he was drinking or high on drugs. As the officers approached the residence, they saw Ligon and observed a sheath knife attached to Ligon's belt. Ligon's girlfriend heard the officers telling Ligon to drop the knife and believed that the officers might have to shoot Ligon. Other witnesses heard the officers repeatedly instructing Ligon to drop the knife and one witness saw the officers attempting to subdue Ligon using pepper spray. The witness then observed Ligon pulling the knife from its sheath and stepping toward Officer Wolfe who was approximately eight to ten feet away. The witness believed that Ligon had became a potential threat to the officers and saw Sgt. Haines fire his weapon one time causing Ligon to fall to the ground. Another witness believed that Ligon was approximately five feet from the officers when he was shot. Sgt. Haines was then

11

heard calling for medical assistance for Ligon. Except as admitted herein, the allegations contained in this paragraph are denied.

46.     It is admitted that on August 28, 2005, former RPD Officer Michelle Peele was off-duty and working providing security at La Rosa Linda's Mexican Restaurant on New Bern Avenue when she observed Nyles Arrington enter her personal vehicle and begin to drive away.   As Arrington drove Peele's vehicle in her general direction on his way out of the parking lot, Peele fired a single shot that struck and killed Arrington. Following an administrative investigation, the City terminated Peele's employment on grounds that she had violated RPD Departmental Operating Instruction 1108-1 (Use of Force and Weapons) which proscribes firing at moving vehicles except under certain very limited circumstances.   Peele appealed her termination administratively before filing an appeal to the Raleigh Civil Service Commission. The Raleigh City Attorney's Office vigorously defended the City's decision to terminate Peele's employment, and the Civil Service Commission affirmed the City's decision.  Peele then filed a Petition for Judicial review in Wake County Superior Court as well as a separate unlawful termination lawsuit. The Raleigh City Attorney's Office represented the City in both Superior Court actions and the City prevailed in both.  Except as admitted herein, the allegations contained in this paragraph are denied.

47.     It is admitted that on April 10, 2013, RPD officers were dispatched in response to three 911 calls made by different citizens reporting a disturbance near the 500 block of Mial Street. One caller reported that a man who lived at 500 Mial Street was walking naked nearby, and shouting obscenities.  A second caller reported a disturbance with a male and possibly a female screaming, and a third caller reported that Jeffrey Thomas Sadler had assaulted a young teen male. Sadler, who was 6'2" tall and weighed 297 lbs. resided at 500 Mial Street and had a history of

mental illness and assaultive behavior. Officers S. M. Archambault and M. A. Ford were the first two officers to arrive and encountered Sadler who was indeed naked, and acting irrational and aggressive. Initially, Sadler was cooperative with the offices, but then spontaneously charged at Officer Ford. Officer Ford retreated, while drawing his TASER and giving verbal commands to Sadler. Sadler ignored Officer Ford's commands and continued to charge at Officer Ford. Officer Ford then fired his TASER at Sadler causing Sadler to go down. Officer Archambault approached Sadler and attempted to handcuff him. However, after the TASER's 5-second cycle, Sadler immediately began to resist Officer Archambault on the ground. Officer Ford activated the TASER again, in an attempt to gain voluntary compliance from Sadler. Officer Archambault continued to try to handcuff Sadler and began to gain some advantage over Sadler, but it was diminished as Sadler again actively resisted after the TASER cycle. This process continued for a total of eleven times until Sadler was successfully handcuffed. Pursuant to RPD policy, Officer Ford immediately requested that EMS respond to medically evaluate Sadler. Before EMS arrived and while Sadler was still on scene and cumulatively monitored by four other RPD officers, he suffered a cardiac event and died. Officers attempted CPR, and EMS appeared on scene very shortly thereafter. A subsequent RPD internal review concluded that no RPD officers engaged in policy violations, unethical behavior, or negligent inaction. Except as admitted herein, the allegations contained in this paragraph are denied.

48. It is admitted that on September 14, 2015, RPD officers responded to a disturbance call at 3032 Slippery Elm Drive. The first two officers to arrive found the original 911 caller who reported that a male later identified as Carl King had ingested crack cocaine, was "going crazy," and may have kicked in the door to a neighbor's house. The Officers observed King sitting on the floor of the entryway, naked, yelling, sweating profusely and swinging a wooden lamp back and

forth violently. The officers were able to grab the lamp and gain control of Kings hands. The officers were only able to handcuff King in front of his body because King continued to resist and bite the officers while screaming loudly and making growling sounds. Within minutes of encountering King the officers recognized King's behavior as a possible medical crisis. EMS and additional check in officers were called to the scene. As additional officers arrived, they observed the first two officers attempting to restrain King as he thrashed around and continued to scream and growl. King's handcuffs were reapplied behind his back in an attempt to better control him, but King continued to thrash around, yell, growl and attempt to bite officers. A leg hobble restraint was applied to King's legs in accordance with RPD policy in an attempt to stop him from kicking and hurting himself or an officer. Upon arrival of EMS, protocols were initiated by medical personnel and King was given a sedative in a further attempt to calm him. Shortly thereafter, EMS and police personnel noticed that King's breathing became shallow and that he was unresponsive. The handcuffs were immediately removed, and EMS personnel began CPR with assistance from RPD officers and members of the Raleigh Fire Department. While efforts were made to revive King for approximately 30-40 minutes, he was pronounced deceased at the scene by medical personnel. Except as admitted herein, the allegations contained in this paragraph are denied.

49. It is admitted that on February 29, 2016 there was an outstanding warrant for the arrest of Akiel Denkins relating to felony drug charges. RPD officer D. C. Twiddy observed Denkins on Bragg Street and began to approach Denkins who had turned and already begun to walk away. Officer Twiddy told Denkins to stop and a foot pursuit ensued. When Officer Denkins caught up with Denkins, Denkins stopped and turned toward Officer Twiddy. Officer Twiddy grabbed Denkins in an effort to take him into custody and Denkins began to resist. While the two struggled, Officer Twiddy felt Denkins reaching for an object in the front of his waistband. Officer

Twiddy observed Denkins start to pull a handgun from the front of his waistband and begin to move it toward Officer Twiddy. While still struggling with Denkins, Officer Twiddy drew his duty weapon and fired multiple shots as Denkins continued to move his own firearm in Officer Twiddy's direction. After the first shots were fired, Officer Twiddy felt Denkins' hand or arm make contact with his duty weapon. Reasonably fearing that Denkins was either going to shoot him or attempt to disarm him of his duty weapon and in an attempt to protect himself from the imminent use of deadly force, Officer Twiddy stepped back and fired additional shots at Denkins, who still had his own firearm in his hand. Denkins fell to the ground and dropped the firearm. Officer Twiddy then radioed for assistance. Additional police units and EMS personnel arrived, and Denkins was pronounced dead at the scene. The handgun that Denkins had pulled from his waistband was determined to have been reported stolen on January 31, 2016. While Officer Twiddy's patrol vehicle was equipped with a mobile video recorder, because the incident took place away from the vehicle, and Officer Twiddy did not have reason to activate his blue lights, which trigger the camera, there was no dash cam video of the encounter between Officer Twiddy and Denkins. Except as admitted herein, the allegations contained in this paragraph are denied.

50.    It is admitted that on August 29, 2016, a resident at 241 Donald Ross Drive called 911 to report that there was a man with a gun outside her residence and that the man had previously been told not to be there. RPD Officer B.K. Burleson was the first officer to arrive and spoke with the resident, who identified the individual with the gun as her boyfriend, Jaqwan Julius Terry. The resident reported that she had telephoned Terry earlier to tell him that she did not want to see him anymore. Terry then came to the residence, behaved aggressively, displayed a handgun and told her that he was not going to allow her to leave him. Terry, who had left the property prior to Officer Burleson's arrival, returned while Officer Burleson was speaking with the resident. The resident

15

pointed to Terry and identified him as the suspect. When Officer Burleson attempted to ask Terry about the report of his earlier threatening behavior, Terry turned and ran. Officer Burleson identified himself as a police officer, commanded Terry to stop, and began to pursue him while radioing for assistance. Officer Burleson caught up with Terry as Terry attempted to climb a fence. As Officer Burleson struggled to gain control of Mr. Terry, he gave multiple commands for Terry to stop resisting and get down on the ground. As the two struggled in a crouched position, Officer Burleson observed a handgun on the ground directly underneath Terry. Officer Burleson pushed Terry in an unsuccessful attempt to distance him from the handgun. Terry picked up the handgun and pointed it directly at Officer Burleson as Officer Burleson was attempting to stand up. Reasonably believing that his life was in immediate danger, Officer Burleson drew his firearm and fired at approximately the same time that Terry fired at Officer Burleson. Officer Burleson was struck but continued to fire his weapon at Terry, who was continuing to point his weapon at Officer Burleson. As Officer Burleson and Terry were exchanging gunfire, RPD Officer B. S. Beausoleil arrived and saw Terry pointing a firearm at Officer Burleson. Reasonably believing that Terry posed an imminent deadly threat to Officer Burleson, Officer Beausoleil fired his weapon at Terry, who fell to the ground, still holding the firearm. Additional units arrived and began to perform first aid on both Officer Burleson and Terry. A short time later, EMS personnel arrived on the scene. Both Officer Burleson and Terry were transported to WakeMed. Terry succumbed to his wounds and died at the hospital. Officer Burelson's and Officer Beausoleil's patrol vehicles are equipped with mobile video recorders (dash cams). Because Officer Burleson never had reason to activate his blue lights, his camera was not recording. The recording from Officer Beausoleil's dash cam did not capture any images from the incident, as it occurred away from the vehicle, but

it did record audio of part of the event. Except as admitted herein, the allegations contained in this paragraph are denied.

51. It is admitted that on April 20, 2019, Officer W. B. Edwards, while on-duty as a City of Raleigh police officer and attired in his full police uniform, attempted to question Soheil Mojarrad after being advised by two eyewitnesses that Mr. Mojarrad had taken a cellular telephone belonging to one of the eyewitnesses and that Mr. Mojarrad had previously trespassed at a Sheetz gas station located at 5200 New Bern Avenue, Raleigh, North Carolina (hereinafter, the "Sheetz"). It is further admitted that when Officer Edwards attempted to speak to Mr. Mojarrad, Mr. Mojarrad began walking away and refused to obey Officer Edwards' lawful commands to stop. It is further admitted that during the entirety of their interaction, Mr. Mojarrad was hostile, profane and verbally abusive toward Officer Edwards. It is further admitted that as Officer Edwards followed Mr. Mojarrad, Mr. Mojarrad turned toward Officer Edwards, drew a folding knife from his pants pocket, and rapidly opened the blade. It is further admitted that throughout their encounter, Officer Edwards attempted to calm Mr. Mojarrad down and engage Mr. Mojarrad in conversation. It is further admitted that when Mr. Mojarrad brandished the knife, Officer Edwards began issuing lawful orders for Mr. Mojarrad to drop the knife and continued to do so for the remainder of their encounter. It is further admitted that Mr. Mojarrad escalated his hostile and threatening behavior by defying Officer Edwards' lawful commands and began approaching Officer Edwards with the apparent intent to use the knife to harm Officer Edwards. It is further admitted that Mr. Mojarrad's hostile statements and threatening conduct caused Officer Edwards to reasonably fear that he was in imminent danger of death or serious bodily injury, and that Officer Edwards fired his service weapon in order to protect himself from Mr. Mojarrad. It is further admitted that Mr. Mojarrad continued to threaten and attempt to approach Officer Edwards several times despite Officer

17

Edwards' continued commands to stop and drop the knife. It is further admitted that Mr. Mojarrad's continued hostile statements and threatening conduct caused Officer Edwards to remain in reasonable fear that he was in imminent danger of death or serious bodily injury, and that Officer Edwards responded to the continued and imminent threat presented by Mr. Mojarrad by firing several additional shots from his service weapon until Mr. Mojarrad no longer presented an imminent threat of death or serious bodily injury. It is further admitted that Mr. Mojarrad continued to present an imminent threat of death or serious bodily injury toward Officer Edwards until Officer Edwards had fired approximately eleven shots in approximately four volleys, and that Mr. Mojarrad died as a result of the wounds sustained in this encounter. Except as admitted herein, the allegations contained in this paragraph are denied.

52. It is admitted that on January 14, 2020, RPD Officer M. R. Steyers conducted a vehicle stop of a driver and vehicle that had just been involved in three previously reported hit and run motor vehicle crashes. The driver, Braily Andres Batista-Concepcion, appeared to be under the influence of an impairing substance and ignored multiple commands to place his hands on the steering wheel and actively resisted Officer Steyers' attempts to remove him from the vehicle. With the assistance of RPD Officer K. A. Strachan, Batista-Concepcion was ultimately removed from the vehicle but then refused to submit peacefully to handcuffing, including refusing to remove his hand from a concealed position underneath his body. The officers used knee strikes and restraining techniques to remove Batista-Concepcion from the vehicle and to secure him in handcuffs. The officers' decisions regarding use of force were based on the totality of the circumstances including, observations of Batista-Concepcion's driving; knowledge of the danger presented to the public by Batista-Concepcion in the immediate past as well as the potential for the danger to continue if Batista-Concepcion were not immediately apprehended; observations of

18

Batista-Concepcion's physical and mental condition; concern that Batista-Concepcion would attempt to flee in the vehicle if not immediately removed and taken into custody; the actions of other unrestrained occupants of the vehicle; Batista-Concepcion's lack of responsiveness to commands; Batista-Concepcion's repetitive non-sensical statements and behavior; Batista-Concepcion's escalation of resistance and non-compliance to basic commands; and the failure of lower levels of force to be effective. Body worn camera and dash camera video from each officer supported the conclusion that the force used to take Batista-Concepcion into custody was reasonable under the circumstances. It is further admitted that on January 30, 2020, RPD Officer W. B. Tapscott was involved in an encounter with Keith Dutree Collins that resulted in the death of Collins. The City has not yet concluded its investigation into the encounter between Collins and Officer Tapscott. However, on January 30, 2020, Wake County District Attorney Lorrin Freeman requested assistance from the North Carolina State Bureau of Investigation concerning this incident, and based on the investigative findings, District Attorney Freeman concluded that Officer Tapscott reasonably believed that his life was endangered when he shot Mr. Collins, that the use of force by Officer Tapscott was lawful, and therefore criminal charges will not be pursued. Except as admitted herein, the allegations contained in this paragraph are denied.

53. The allegations contained in this paragraph are denied.

54. It is admitted that on August 17, 2018, some RPD Officers were equipped with BWCs and some RPD patrol cars were equipped with MVRs. It is further admitted that the RPD enacted Written Directive 1109-18, which governs the use of BWCs and MVRs on January 25, 2018, and that this policy was prepared by Defendant Deck-Brown and approved by Defendant Ruffin Hall. Except as admitted herein, the allegations contained in this paragraph are denied.

19

55.     It is admitted that on August 17, 2018, some of the Defendant Officers were equipped with BWCs and some of the Defendant Officers' patrol cars were equipped with MVRs. It is further admitted that the contents of any video or audio recording captured by the Defendant Officers' BWCs or MVRs during their encounter with Plaintiff speak for themselves.  It is further admitted that the RPD enacted Written Directive 1109-18, which governs the use of BWCs and MVRs on January 25, 2018, that this policy was prepared by Defendant Deck-Brown and approved by Defendant Ruffin Hall, and that the provisions of this policy speak for themselves.  Except as admitted herein, the allegations contained in this paragraph are denied.

56.     It is admitted that on August 17, 2018, some of the Defendant Officers were equipped with BWCs and some of the Defendant Officers' patrol cars were equipped with MVRs. It is further admitted that the contents of any video or audio recording captured by the Defendant Officers' BWCs or MVRs during their encounter with Plaintiff speak for themselves.   It is further admitted that the RPD enacted Written Directive 1109-18, which governs the use of BWCs and MVRs on January 25, 2018, that this policy was prepared by Defendant Deck-Brown and approved by Defendant Ruffin Hall, and that the provisions of this policy speak for themselves.  Except as admitted herein, the allegations contained in this paragraph are denied.

57.     It is admitted that under certain circumstances BWCs and MVRs may be synced to activate simultaneously.  It is further admitted that the contents of any video or audio recording captured by the Defendant Officers' BWCs or MVRs during their encounter with Plaintiff speak for themselves.   Except as admitted herein, the allegations contained in this paragraph are denied.

58.     It is admitted that when the RPD began considering deployment of body-worn cameras, the RPD reviewed BWC policies from other law enforcement agencies across the nation and drafted proposed BWC policy language (hereinafter, the "Draft BWC Policy") to add to

20

Written Directive 1109-18.  The RPD held internal meetings to review the Draft BWC Policy and conducted public meetings to obtain community feedback regarding the Draft BWC Policy.  The Draft BWC Policy was further refined based on input received during these meetings.  The RPD then applied to the United States Bureau of Justice Assistance (hereinafter, the "USBJA") for a grant to partially fund the BWC equipment.  As part of the grant application process, the RPD submitted the Draft BWC Policy to the USBJA for review and approval.  The USBJA reviewed the Draft BWC Policy and recommended changes.  The RPD incorporated the USBJA's recommendations into the Draft BWC Policy and the USBJA awarded the grant funding to the RPD.  The final draft of the Draft BWC Policy that incorporated the recommendations of the USBJA was finalized as Written Directive 1109-18.  Except as admitted herein, the allegations contained in this paragraph are denied.

59.     It is admitted that on April 25, 2019, Chief Deck-Brown issued "Special Memorandum #2019 - 01: Change to DOI 1109-18 Body Worn Cameras and Mobile Video Recording," and that this Special Memorandum speaks for itself.  Except as herein admitted, the allegations contained in this paragraph are denied.

60.     The allegations contained in this paragraph are denied.

61.     It is admitted that the RPD conducts a thorough review of all uses of force by RPD officers and investigates all complaints of excessive use of force by RPD officers, and that such reviews or investigations would include the operation of RPD-issued equipment.  Except as admitted herein, the allegations contained in this paragraph concern confidential personnel information protected from disclosure by N.C. Gen. Stat. § 160A-168.  Therefore the City is barred from disclosing confidential personnel information in response to these allegations.

21

62.     It is admitted that the RPD enacted Written Directive 1108-01 which governs the use of force and weapons on October 7, 2016, that this policy was prepared by Chief Deck-Brown and approved by City Manager Hall, that this policy was in effect at the time of Plaintiff's death, and that the provisions of this policy speak for themselves.   Except as admitted herein, the allegations contained in this paragraph are denied.

63.     It is admitted that the RPD enacted Written Directive 1108-01 which governs the use of force and weapons on October 7, 2016, that this policy was prepared by Chief Deck-Brown and approved by City Manager Hall, that this policy was in effect at the time of Plaintiff's death, and that the provisions of this policy speak for themselves.   Except as admitted herein, the allegations contained in this paragraph are denied.

64.     The allegations contained in this paragraph are denied.

65.     It is admitted that the RPD enacted Written Directive 1108-01 which governs the use of force and weapons on October 7, 2016, that this policy was prepared by Chief Deck-Brown and approved by City Manager Hall, that this policy was in effect at the time of Plaintiff's death, and that the provisions of this policy speak for themselves.   Except as admitted herein, the allegations contained in this paragraph are denied.

66.     The allegations contained in this paragraph are denied.

67.     The allegations contained in this paragraph are admitted.

68.     The City denies that the RPD lacks any written or formal policy, custom or standards regarding de-escalation of interactions with citizens in the field.  The City further denies that the RPD does not provide effective training for its officers regarding de-escalation techniques. Finally, the City denies that the RPD does not otherwise require that its officers de-escalate situations to minimize the need for any show or use of force.

69.     The City denies that the RPD does not have any written crisis intervention techniques or training regarding interaction in the field with persons suffering from mental health issues or episodes.  The City also denies that Crisis Intervention Training (hereinafter, "CIT") is "standard for law enforcement."  Instead, the adoption and implementation of CIT varies according to the needs and resources of individual law enforcement agencies.  The RPD has conducted Mental Illness training for over twenty-five years as part of Basic Law Enforcement Training.  In addition, for approximately fourteen years, the RPD has given officers the opportunity to attend an additional 40-hour CIT course conducted in conjunction with Alliance Behavioral Health/Wake Technical Community College.  In August 2018, this additional 40-hour CIT training was incorporated into the RPD-specific portion of the Raleigh Police Academy curriculum.  Except as admitted herein, the allegations contained in this paragraph are denied.

70.     The City denies that the RPD's written policies regarding interaction with mentally ill persons is minimal and vague. The City admits that the statements quoted in this paragraph are excerpts from RPD Written Directive 1109-12 entitled "Itinerants, Indebriates, and Mental Health Consumers," and that this Written Directive speaks for itself. Except as admitted herein, the allegations contained in this paragraph are denied.

71.     The allegations contained in this paragraph are denied.

72.     The allegations contained in this paragraph are denied.

73.     The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

74.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

23

75.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

76.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

77.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

78.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

79.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

80.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

81.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

82.     The allegations set forth in this paragraph are not directed to the City.  Therefore the City is not required to offer a responsive pleading.  To the extent that a responsive pleading is required, the allegations set forth in this paragraph are denied.

83.     The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

84.     It is admitted that at all times relevant herein, the City was the employer of Defendant Krueger, Defendant Wall, Defendant Edmonds, Defendant Glenn, Defendant Henry, Defendant Harris, Defendant Jones, and Defendant Horner.  The remaining allegations of this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent that a responsive pleading is required, the remaining allegations of this paragraph are denied.

85.     The allegations contained in this paragraph are denied.

86.     The allegations contained in this paragraph are denied.

87.     The allegations contained in this paragraph, including subparts (a) through (j) are denied.

88.     The allegations contained in this paragraph are denied.

89.     The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

90.     It is admitted that Chief Deck-Brown and City Manager Hall were responsible for providing training to RPD officers that conformed to standards mandated by the State of North Carolina.  Except as admitted herein, the allegations contained in this paragraph are denied.

91.     The allegations contained in this paragraph are denied.

92.     The allegations contained in this paragraph, including subparts (k) through (u) are denied.

93.     The allegations contained in this paragraph are denied.

94.     The allegations contained in this paragraph are denied.

95.     The allegations contained in this paragraph are denied.

96.     The allegations contained in this paragraph are denied.

97.     The allegations contained in this paragraph are denied.

98.     The allegations contained in this paragraph are denied.

99.     The allegations contained in this paragraph are denied.

100.    The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

101.    The allegations contained in this paragraph, including subparts (e) through (j) are denied.

102.    The allegations contained in this paragraph are denied.

103.    The allegations contained in this paragraph are denied.

104.    With the exception of those portions of this paragraph that constitute prayers for relief and to which no responsive pleading is required, the allegations contained in this paragraph are denied.

105.    The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

106.    The allegations contained in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent that a response is required, and specifically as to any allegation or implication that the City, Chief Deck-Brown, or City Manager Hall failed to properly perform any duty or acted negligently with respect to Plaintiff, the allegations contained in this paragraph are denied.

107.    The allegations contained in this paragraph are denied.

108.    The allegations contained in this paragraph, including subparts (a) through (h) are denied.

109.    The allegations contained in this paragraph are denied.

110.    With the exception of those portions of this paragraph that constitute prayers for relief and to which no responsive pleading is required, the allegations contained in this paragraph are denied.

111.    The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

112.    The allegations contained in this paragraph are denied.

113.    The allegations contained in this paragraph are denied.

114.    The allegations contained in this paragraph are denied.

115.    The allegations contained in this paragraph are denied.

116.    The allegations contained in this paragraph are denied.

117.    The allegations contained in this paragraph are denied.

118.    The allegations contained in this paragraph are denied.

119.    The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

120.    The allegations contained in this paragraph are denied.

121.    The allegations contained in this paragraph are denied.

122.    The allegations contained in this paragraph are denied.

123.    The allegations contained in this paragraph are denied.

124.    The allegations contained in this paragraph are denied.

27

125.	The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

126.	The allegations contained in this paragraph are denied.

127.	The allegations contained in this paragraph are denied.

128.	The allegations contained in this paragraph are denied.

129.	The allegations contained in this paragraph are denied.

130.	The allegations contained in this paragraph are denied.

131.	The allegations contained in this paragraph are denied.

132.	The City incorporates by reference its responses to the preceding paragraphs as if fully restated herein.

133.	The allegations contained in this paragraph are denied.

134.	The City lacks information sufficient to form a belief as to the truth or falsity of these allegations.

135.	The allegations contained in this paragraph are denied.

136.	The allegations contained in this paragraph are denied.

137.	The allegations contained in this paragraph are denied.

138.	The allegations contained in this paragraph are denied.

SECOND DEFENSE

As an affirmative defense, and to the extent that Plaintiff seeks to recover punitive damages from the City,

a)	no statutory basis exists to support an award of punitive damages against the City arising out of negligence or Constitutional claims;

b)	such claim for punitive damages is barred or limited by Chapter 1D of the North Carolina General Statutes and by common law principles; and

28

c)      such claims violate the Constitution of the United States in that they seek to deprive the City of property without due process of law, violate the Constitution's provisions concerning equal protection, and violate the Constitution's prohibition against the imposition of excessive fines.

THIRD DEFENSE

As an affirmative defense, at all times relevant herein, the Defendant Officers acted within the course and scope of his employment with the City, their conduct was objectively reasonable under the circumstances, and their conduct did not violate any clearly established statutory or Constitutional rights of the Plaintiff. Because the Defendant Officers' conduct was objectively reasonable, the Plaintiff's claims are barred by qualified immunity. Because qualified immunity bars Plaintiff's claims against the Defendant Officers in their individual capacities, the Plaintiff's claims against the City based on the Defendant Officers' conduct are likewise barred.

FOURTH DEFENSE

As an affirmative defense, to the extent that the Defendant Officers acted with malice or corruption and that such conduct proximately caused injury to Plaintiff, which is specifically denied, such malicious or corrupt conduct was not within the course and scope of the Defendant Officers' employment with the City of Raleigh and cannot form the basis of liability against the City. Therefore, to the extent that this Court or a jury determines that the Defendant Officers acted maliciously or corruptly, then the City has no vicarious liability for the Defendant Officers' acts committed outside the course and scope of City employment.

FIFTH DEFENSE

As an affirmative defense, the City and its leaders have (1) implemented policies concerning arrest and use of force; (2) conducted appropriate training of all of its police officers; (3) and appropriately investigated claims of excessive uses of force by its police officers. These

29

policies, customs, and training comport with the United States Constitution and are pled in bar of any recovery in this action.

## SIXTH DEFENSE

As an affirmative defense, no act or actionable omission by the City was a proximate cause of any of the alleged violations or damages Plaintiff seeks to recover.

## SEVENTH DEFENSE

As an affirmative defense, no persistent and widespread policy or custom of the City caused or resulted in a deprivation or violation of Plaintiff's Constitutional rights. Therefore, the City has no liability to Plaintiff in this action.

## EIGHTH DEFENSE

As an affirmative defense, the Plaintiff acted in a manner so as to violate the rights of others. The Plaintiff's constitutional rights, if any, are subordinate to and yield to the rights of innocent third parties whose rights the Plaintiff violated. The City pleads the Plaintiff's conduct in bar of any constitutional claim.

## INCORPORATION OF THE DEFENDANT OFFICERS' AFFIRMATIVE DEFENSES

With respect to any of Plaintiff's claims against the City which are grounded in derivative liability, vicarious liability, or *respondeat superior*, the City incorporates by reference as if fully restated herein all affirmative defenses pled by the Defendant Officers in their individual capacities; and to the extent that any of Plaintiff's claims are defeated in whole or in part by these defenses, any vicarious liability assigned to the City is likewise extinguished.

## RESERVATION OF RIGHTS

The City reserves the right to amend its Answer to the First Amended Complaint and to assert additional affirmative defenses as the claims of the Plaintiff are more fully disclosed during the course of this litigation.

## JURY DEMAND

Pursuant to North Carolina General Statutes § 160A-485(d), the City of Raleigh does not request a trial by jury on issues related to insurance or governmental immunity. The City does, however, request a trial by jury on all other issues of fact so triable herein.

WHEREFORE, having responded to the allegations of the First Amended Complaint, the City respectfully requests that:

1.      Plaintiff's prayer for relief be denied in its entirety;

2.      Plaintiff have and recover nothing of the City;

3.      The costs of this action, including reasonable attorney's fees, be taxed against the Plaintiffs and

4.      For such other and further relief as this Court deems just and proper.

This the 21st day of June, 2022.

                                        **CITY OF RALEIGH**
                                        **Robin L. Tatum**
                                        **City Attorney**

                                        By:     /s/  Hunt K. Choi
                                                HUNT K. CHOI
                                                Deputy City Attorney
                                                NC State Bar No. 24172
                                                Post Office Box 590
                                                Raleigh, North Carolina 27602
                                                Telephone:  (919) 996-6560
                                                Facsimile:  (919) 996-7021
                                                Email:  hunt.choi@raleighnc.gov
                                                COUNSEL FOR CITY OF RALEIGH

31

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No. 5:20-cv-00559-D

| | |
|---|---|
| FREDRICK DARNELL HALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| THE CITY OF RALEIGH NORTH | ) |
| CAROLINA, LT KLUEGER, K.N. WALL, | ) |
| A.E. JONES, S.O. EDMONDS, M.O. GLEN, | ) |
| S.T. HENRY, B.S. HARRIS, M.S. HORNER, | ) |
| JOHN DOE I, JOHN DOE II, JOHN DOE III, | ) **CERTIFICATE OF SERVICE** |
| JOHN DOE IV, JOHN DOE V, and JOHN | ) |
| DOE VI in their individual capacities | ) |
| | ) |
| Defendants | ) |

I hereby certify that on the 21st day of June, 2022, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

Catharine E. Edwards, Esq.　　　　Rodney E. Pettey, Esq.
Kristen Lin Beightol, Esq.　　　　　Samuel G. Thompson, Jr., Esq.
Edwards Beightol, LLC　　　　　　Yates, McLamb & Weyher, L.L.P.
Post Office Box 6759　　　　　　　Post Office Box 2889
Raleigh, NC 27628　　　　　　　　Raleigh, NC 27602-2889
Tel: (919) 636-5100　　　　　　　　Tel: (919) 835-0900 Ext. 158
Fax: (919) 495-6868　　　　　　　　rpettey@ymwlaw.com
Email: cee@eblaw.com　　　　　　　bthompson@ymwlaw.com
Email: klb@eblaw.com　　　　　　　*Attorneys for the Individual Defendants*
*Attorneys for Plaintiff*

And I hereby certify that I have mailed the document to the following non CM/ECF participants:

32

Respectfully submitted,

**CITY OF RALEIGH**
**Robin L. Tatum**
**City Attorney**

By:    <u>/s/  Hunt K. Choi</u>
        HUNT K. CHOI
        Deputy City Attorney
        NC State Bar No. 24172
        Post Office Box 590
        Raleigh, North Carolina 27602
        Telephone:  (919) 996-6560
        Facsimile:  (919) 996-7021
        Email:  hunt.choi@raleighnc.gov
        COUNSEL FOR CITY OF RALEIGH